UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
LAFAYETTE DIVISION

| | |
|---|---|
| ANNA KATHLEEN BONE, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>CAROLYN W. COLVIN, )<br>Acting Commissioner of Social Security )<br>Administration, )<br>)<br>Defendant. ) | CAUSE NO. 4:14-CV-08-PPS |

## OPINION AND ORDER

Plaintiff Anna Bone appeals the Social Security Administration's decision to deny her application for disability insurance benefits. An administrative law judge denied Bone's request for benefits and found that Bone was not disabled within the meaning of the Social Security Act. Bone argues that the ALJ erred by failing to credit the opinions of her treating physicians. But because those opinions were inconsistent with the objective evidence, the ALJ correctly rejected them. For that reason, the decision of the ALJ will be affirmed.

## BACKGROUND

Those looking for a detailed discussion of Bone's medical records are directed to the extensive summaries in the ALJ's decision (R. 21-37) and in Bone's opening brief [DE 30 at 6-14]. Rather than simply reiterating those summaries, I will give a brief overview of Bone's history of health issues.

Bone is a thirty-five year-old college graduate who worked for several years as a

sign language interpreter in San Diego schools. (R. 52-54.)[1] Starting in 2005, she began to experience tendinitis pain in her hands and elbows. (R. 58-59.) Bone managed to continue working for a couple of years under medical restrictions. But, in November 2007, the tendinitis became so bad that Bone had to stop. *Id*. She has not worked since.

Bone has other physical problems including calcaneal spurs in her heels, joint pain, and degenerative disc disease. Additionally, Bone underwent spinal fusion surgery in December 2009 to ease her chronic back pain. (R. 29-30.)

But notwithstanding these considerable problems, the focus of this appeal is Bone's narcolepsy, of which she has a long history. She testified that she experienced narcoleptic symptoms, including cataplexy (sudden muscle weakness), night terrors, and daytime sleepiness dating back to childhood. (R. 56-57.) She was diagnosed as narcoleptic in 2003. Although narcolepsy cannot be cured, the symptoms can be controlled and Bone has taken a range of medication to try and control the narcolepsy. Since 2005, Bone's primary medication has been Xyrem. (R. 1108.) Xyrem is a strong sedative that helps Bone sleep through the night. (R. 61.) She also takes an amphetamine during the day to combat her daytime sleepiness. (R. 1415.)

Bone applied for disability benefits on October 5, 2010, alleging an onset date of November 28, 2007. The claims were denied initially, and then again upon reconsideration. Subsequently, Bone filed a written request for a hearing. At the

---

[1] In the Plaintiff's briefing, Ms. Bone is erroneously described as a 59 year old who previously worked as a truck driver and car salesman [DE 30 at 5-6]. This must have been a "cut and paste" error on the part of Ms. Bone's counsel.

hearing, Bone testified along with a vocational expert. Bone testified that she suffered from narcolepsy, tendinitis, and chronic back and neck pain. (R. 47-93.)

The ALJ issued a decision denying benefits. (R. 21-37.) At Step One, the ALJ found that Bone met the insured status requirements of the Social Security Act, and that she has not engaged in substantial gainful activity since November 28, 2007, the alleged onset date. At Step Two, the ALJ concluded that Bone had the following severe impairments: narcolepsy; epicondylitis, worse on the right; bilateral calcaneal spurs; degenerative disc disease of the cervical spine; and status/post lumbar fusion. The ALJ found Bone also suffered from depression, but that the depression was a non-severe impairment.

At Step Three, the ALJ concluded that Bone does not have an impairment or combination of impairments meeting or medically equaling one of the listed impairments. At Step Four, the ALJ found that Bone had the capacity for sedentary work, with the following limitations: Bone can never climb ladders, ropes, or scaffolds; can no more than occasionally climb ramps and stairs, balance, stoop, kneel, crouch or crawl. She can frequently, but not constantly, use her hands for handling and fingering bilaterally, but can no more than occasionally perform overhead lifting bilaterally. Moreover, she should avoid concentrated exposure to extreme cold or heat.

At Step Five, the ALJ found that Bone could not perform any past relevant work but that there was a sufficiently significant number of jobs in the national economy that she could perform.

**DISCUSSION**

My review of an ALJ's decision to deny social security benefits is limited to determining whether the decision is supported by substantial evidence. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). "Evidence is substantial if a reasonable person would accept it as adequate to support the conclusion." *Id.* The question before me is not whether or not Bone is disabled, but whether there is substantial evidence in the record supporting the ALJ's decision that she is not disabled. *Books v. Chater*, 91 F.3d 972, 977 (7th Cir. 1996). In other words, the ALJ's decision, if supported by substantial evidence and reached under the correct legal standard, will be upheld even if reasonable minds could differ as to the appropriate conclusion. *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000).

To receive disability benefits under the Social Security Act, a claimant must be "disabled" as defined by the Act. 42 U.S.C. § 423(a)(1)(E). A claimant is deemed to be disabled if she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Moreover, a claimant's physical or mental impairment or impairments must be of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

Bone's primary argument on appeal is that the ALJ did not fully credit the opinions of her treating physicians, Dr. Arthur Rosen and Dr. Khaled Hammoud. Rosen is a neurologist who treated Bone for her narcolepsy from 2008 until 2011. Hammoud is also a neurologist and started treating Bone for narcolepsy in 2012. Both submitted Impairment Questionnaires as part of Bone's disability application process, and these questionnaires are the focus of Bone's argument.

Dr. Rosen opined in his questionnaire that Bone's narcolepsy would cause her to need hour-long breaks every two to four hours and to miss work more than three times per month. (R. 1240.) If true, this would make Bone virtually unemployable. For his part, Dr. Hammoud opined that Bone's narcolepsy caused cognitive problems that would give her trouble at work. (R. 1452.) This claim was echoed in a Medical Source Statement submitted by Rosen. In the statement, Rosen claimed Bone suffered from decreased cognitive function and memory impairment. (R. 1200.) Serious cognitive problems would likewise make it difficult for Bone to find employment.

The ALJ did not credit Rosen and Hammoud's opinions regarding the severity of Bone's condition. The ALJ accounted for Bone's narcolepsy by restricting Bone to sedentary work, but he did not believe Bone had cognitive issues and did not believe that she would miss so much work. (R. 28-29.) The ALJ justified his decision on the grounds that the physicians' opinions were not backed up by the medical record.

In ordinary circumstances, the opinion of a treating physician like Rosen or Hammoud is entitled to controlling weight. *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th

5

Cir. 2004). But a treating physician's opinion receives controlling weight only if it is well supported by "medical findings and not inconsistent with other substantial evidence in the record." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). And "[a]n ALJ is not required to accept a doctor's opinion if it is brief, conclusory, and inadequately supported by clinical findings." *Gildon v. Astrue*, 260 Fed. App'x 927, 929 (7th Cir. 2008) (citations and quotations omitted). So the question in this case is whether Dr. Rosen and Dr. Hammoud's opinions are supported by the medical evidence. I agree with the ALJ that they are not.

I'll start with Bone's cognitive functioning. There is simply nothing in the record suggesting Bone has a cognitive impairment, and there is plenty suggesting she does not. In fact every single one of Rosen's treatment notes states that Bone has no cognitive problems. (R. 572-576, 1202-1204.) The same goes for Hammoud's notes. (R. 1415-1417.) Moreover, the consulting physician who examined Bone stated that Bone's cognition was "very good." (R. 1135.) The consulting psychologist had a similarly positive report, noting that Bone did not show "any difficulties with the cognitive aspects of working or in interaction with coworkers." (R. 1138-1142.) Since the physicians' claims regarding Bone's cognitive abilities were flatly contradicted by the medical record, the ALJ was justified in refusing to credit these opinions.

It's a similar story with Rosen's claim that Bone would miss more than three days of work a month and would need hours of breaks per day. As the ALJ pointed out, Rosen's opinion was not supported by clinical findings. There is almost nothing in the

medical records justifying such severe limitations. In fact, it is the opposite. With the exception of the time Bone quit taking her medication while breast-feeding, the treatment notes consistently state that Bone's narcolepsy symptoms were under control. (R. 572-576, 1202-1204, 1415-1417, 1428.)

The primary support for Rosen's opinion comes from Rosen's own Medical Source Statements. But these Statements conflict with the medical evidence, and each other, in such a way as to seriously undermine their credibility.

Rosen submitted two Medical Source Statements, one dated March 8, 2011 and the other undated, but likely from around the same period. (R. 1199-1201.) As I've already mentioned, the Medical Source Statements state that Bone suffers from cognitive defects, while ample medical evidence suggests that she does not. But this is not the only problem with the Statements. In the March 8 Statement Rosen opines that Bone's response to medication "has been poor at best." (R. 1199.) But Rosen's own treatment records consistently state the exact opposite — that Bone had a "good" response to the medication. (R. 572-576, 1428.) Bone herself apparently agreed with this assessment, telling the consulting psychologist that the medication was effective. (R. 1141.) Finally, in the other, undated, Medical Source Statement, Rosen contradicts his claim, writing that "on her current medication [Bone's] symptoms are fairly well-controlled." (R. 1200.)

More to the point, in the March 8 statement, Rosen stated that Bone's narcolepsy resulted in "four or five episodes of uncontrollable sleep per day" with each episode

7

lasting from a half hour to an hour. (R. 1199.) This is similar to what Rosen wrote on the Impairment Questionnaire. The problem is that Bone herself denied bouts of uncontrollable sleep. In her testimony before the ALJ, she stated that, on her current medication, she no longer falls asleep suddenly. (R. 55.) Instead, she has periods where she feels like she is in a "fog", but that the "fog lifts" if she is active. (R. 54-55.) And Rosen again undercut his own claim. In the other Medical Source Statement, instead of hour long bouts of uncontrollable sleep, Rosen states that Bone requires occasional naps as short as ten minutes. (R. 1200.)

Where an ALJ discounts a treating physician's opinion after considering the extent to which the opinion is usupported by medical finding and is consistent with substantial evidence in the record, the ALJ need only "minimally articulate his reasons for doing so." *Elder v. Astrue*, 529, F.3d 408, 415 (7th Cir. 2008). The ALJ met that burden here. In his opinion, the ALJ compared the strong claims made by Doctors Rosen and Hammoud to the medical evidence and set forth his reasons for finding these claims wanting. Since the ALJ articulated his reasons and was supported by substantial evidence, I must affirm.

There is one final issue. Bone also accuses the ALJ of erring by failing to call in a medical examiner to evaluate certain medical evidence. The bulk of the evidence in this case was examined by both a medical doctor and a psychologist. (R. 1233-34.) But Bone submitted additional evidence after the review had taken place. Bone argues that the ALJ shouldn't have evaluated this evidence without soliciting another opinion from a

8

medical expert. The ALJ is obliged to submit "new and potentially decisive" medical evidence to professional scrutiny in order to develop a full and fair record. *See Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014). But the obligation to develop a full record is not limitless. *See Thomas v. Colvin*, 745 F.3d 802, 807 (7th Cir. 2014) (citations omitted). Bone has not been able to articulate what a third medical examiner would have added to the record. For example, she hasn't pointed to any actual instance of the ALJ misreading or misinterpreting the new medical evidence or pointed to an important piece of evidence the ALJ overlooked. Because the ALJ has sufficiently developed the record, this argument fails.

## CONCLUSION

The ALJ provided legitimate reasons for his opinion. While reasonable minds could differ, the only issue is whether the conclusion reached by the ALJ was supported by substantial evidence, and it was. Accordingly, the decision of the ALJ is **AFFIRMED**.

**SO ORDERED.**

ENTERED: February 13, 2015

                                          s/ Philip P. Simon
                                          PHILIP P. SIMON, CHIEF JUDGE
                                          UNITED STATES DISTRICT COURT